## ADMINISTRATIVE SERVICES AGREEMENT

THIS ADMINISTRATIVE SERVICES AGREEMENT ("Agreement") is entered into effective January 1, 1998, by and between Ross University School of Medicine, Limited (the "School of Medicine"), incorporated under the laws of the Commonwealth of Dominica, West Indies, and Dominica Management, Inc., ("DMI"), incorporated under the laws of the State of New York.

### RECITALS

A.  The School of Medicine owns and operates a medical school in the Commonwealth of Dominica, West Indies. The School of Medicine's students include students from many countries, including the United States.

B.  DMI has the assets, experience, and expertise to provide administrative services to institutions of higher education.

C.  The School of Medicine desires to contract with DMI to obtain administrative services for the School of Medicine in the United States, and DMI wishes to contract with the School of Medicine to provide those services.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and promises contained herein, the parties, intending to be legally bound, agree as follows:

### ARTICLE I

### ENGAGEMENT AND RESPONSIBILITIES OF DMI

**Section 1.1**  **Engagement**. The School of Medicine hereby engages DMI to provide administrative services to the School of Medicine in the United States as described in this Agreement, and DMI hereby accepts the engagement under the terms and conditions set forth in this Agreement.

**Section 1.2**  **Authority and Responsibilities of DMI**. Subject to the terms of this Agreement, DMI shall have the authority and responsibility to manage and conduct the day-to-day aspects of the School of Medicine's administrative operations that are physically located in the United States, with the exception of the administration of the School of Medicine's participation in the federal student financial aid programs under the Higher Education Act of 1965, as amended. Without limiting the foregoing, DMI shall perform the following services:

1.2.1   Administrative Office. DMI shall maintain an administrative office or offices in the United States, suitable for providing administrative services to the School of Medicine, the locations of which shall be reasonably acceptable the School of Medicine, and shall maintain such offices throughout the term of this Agreement.

1.2.2   Provision of Equipment. DMI shall maintain such equipment as may be reasonably required for use in providing administrative services, to the School of Medicine in the United States.

1.2.3   Supplies. DMI shall furnish such supplies as are reasonably necessary for the proper and efficient provision of administrative services to the School of Medicine in the United States.

1.2.4   Student Records. DMI shall provide all services in the United States relating to the maintenance of student records.

1.2.5   Billing and Collection.

(a)   DMI shall, on behalf of the School of Medicine and on the billhead of the School of Medicine as its agent, bill and collect the School of Medicine's tuition and fee charges for educational and related services provided by or on behalf of the School of Medicine during the term of this Agreement. DMI's billing and collection activities shall be in accordance with protocols approved by the School of Medicine. Solely for the purpose of carrying out the billing and collection services hereunder, DMI shall have full authority to receive, take possession of, and endorse in the name of the School of Medicine, for deposit in a bank account designated by the School of Medicine, any checks, drafts, notes, money orders, cash, wire transfers, electronic fund transfers, and other payments or instruments received in payment of the School of Medicine's invoices.

(b)   The School of Medicine shall provide to DMI upon request all records necessary to document and support the tuition and fees charged by the School of Medicine. DMI shall maintain complete and accurate records, based on information provided by the School of Medicine, consistent with the general practices of DMI from time to time, of all fees, charges, and billings of the School of Medicine. The School of Medicine or the School of Medicine's duly authorized agent shall have the right at all reasonable times and upon the giving of reasonable notice to examine, inspect, and copy the records of DMI pertaining to such fees, charges, billings, costs, and expenses. The School of Medicine shall deliver to DMI an initial schedule for all of the School of

Medicine's tuition and fees (the "Fee Schedule"), a copy of which is attached hereto as **Exhibit A** and incorporated herein by this reference. Thereafter, the School of Medicine shall give DMI at least 30 days' prior written notice of any changes in the School of Medicine's Tuition and Fee Schedule.

(c)  DMI shall establish a separate bank account (the "Bank Account") in the School of Medicine's name but from which both the School of Medicine and DMI shall have authority to withdraw funds. DMI's authority to withdraw funds from the Bank Account shall be solely for the purpose of withdrawing amounts to pay obligations incurred by it pursuant to the approved Budget in accordance with **Section 1.2.8** of this Agreement. The School of Medicine shall retain the right to revoke DMI's authority to withdraw funds from the Bank Account at any time. Unless otherwise directed by the School of Medicine, all funds collected by DMI in payment of the School of Medicine's invoices shall be deposited in the Bank Account.

(d)  On or before the 30th day of each calendar month during the term of this Agreement, DMI shall, and is hereby authorized to, disburse from the Bank Account to DMI the amounts owed by the School of Medicine to DMI under Article IV hereof for the preceding month.

(e)  The School of Medicine's funds and DMI's funds shall at all times be kept in separate bank accounts and there shall be no commingling of their respective cash assets.

1.2.6  Staffing of Administrative Office. DMI shall employ such personnel as may be reasonably required to provide the School of Medicine with such accounting, admissions, bursar, clinical program management, management information systems, and registrar services as the School of Medicine may reasonably require in the United States, and such executive personnel as may be reasonably required for the proper and efficient operation of DMI' administrative office (collectively, the "Administrative Personnel"). In addition, DMI shall employ such support personnel, including receptionists, secretaries, clerks, management, billing, collection, and purchasing personnel, and such other personnel as may be deemed reasonably necessary by DMI for the proper and efficient operation of DMI' administrative office (collectively, the "Support Personnel").

3

(a) DMI shall: (i) train, manage, and supervise all Support and Administrative Personnel; (ii) hire and fire all Support Personnel; and, after consultation with the School of Medicine, all Administrative Personnel; (iii) determine the salaries, fringe benefits, bonuses, health and disability insurance, workers' compensation insurance, and any other benefits for all Support Personnel and, after consultation with the School of Medicine, all Administrative Personnel; and (iv) be responsible for any appropriate disciplinary action required to be taken against Support Personnel and, after consultation with the School of Medicine, all Administrative Personnel.

(b) In recognition of the fact that Administrative and Support Personnel employed by DMI under this Agreement may perform similar services from time to time for others, this Agreement shall not prevent DMI from performing similar services for other institutions of higher education or restrict DMI from using the Administrative and Support Personnel to perform services for others.

1.2.7 Marketing. DMI shall assist the School of Medicine in marketing its educational programs in the United States.

1.2.8 Payment of Accounts and Indebtedness.

(a) General. DMI shall be responsible for making contractual payments to affiliated hospitals on behalf of the School of Medicine, paying professional liability insurance premiums for DMI students studying in the United States pursuant to contracts with affiliated hospitals, and paying trade accounts, amounts due on short-term and long-term indebtedness, taxes, and all other United States obligations incurred by the the School of Medicine. These obligations shall be as set forth on the Budget approved by DMI and the School of Medicine, a copy of which is attached hereto as **Exhibit B.**

(b) Payroll. DMI shall, at the request of the School of Medicine, act or arrange for a payroll agent to make payment to or in respect of employees of the School of Medicine employed outside the United States.

(c) DMI Funds. In no event shall DMI have any obligation to supply out of its own funds working capital for the School of Medicine.

1.2.9 Accounting and Financial Records. Subject to the written policies of the School of Medicine, DMI shall cause to be prepared and presented to the School of Medicine the following financial reports:

(a) Within thirty (30) days after the end of each calendar month, a

4

balance sheet dated as of the last day of that month, and a statement showing the income and expenses of the School of Medicine for that month and for the fiscal year to date;

(b) Within sixty (60) days after the end of each fiscal year of the School of Medicine, a balance sheet, dated as of the last day of that fiscal year, and a statement of the income and expenses of The School of Medicine for the fiscal year then ended; and

(c) Such other reports as the School of Medicine and DMI consider appropriate to keep the School of Medicine informed as to its financial condition.

1.2.10 Professional Assistance. DMI shall arrange for the provision of professional assistance to the School of Medicine through accountants, attorneys, and other advisors, subject to the advance approval of the School of Medicine, as may be necessary for the operation of the School of Medicine's business.

1.2.11 Reliance. In furtherance of the objectives of this Agreement, DMI may rely upon instructions received from the President of the School of Medicine, or such other representative of the School of Medicine as the School of Medicine's Board of Directors may designate, as to any acts to be performed by DMI.

1.2.12 Subcontracting of DMI's Services. DMI is hereby expressly authorized to subcontract with other persons or entities for any of the services DMI is required to perform under this Agreement, provided that the School of Medicine shall have been notified in writing and shall have approved such subcontract in advance, except that DMI shall remain responsible for all services performed by such other persons or entities.

**Section 1.3**   Educational and Professional Matters. Under no circumstances shall DMI be responsible for any educational decision making or the delivery of any educational instruction to students of the School of Medicine. DMI may, however, consult with the School of Medicine and make recommendations concerning such matters.

## ARTICLE II

## FISCAL MATTERS

**Section 2.1** Accounting Records. DMI shall maintain a suitable accounting system for the School of Medicine and shall furnish monthly compilations to the School of Medicine.

**Section 2.2** Budgets

2.2.1 Duties of DMI. If requested by the Board of Directors of the School of Medicine, DMI shall submit to the School of Medicine not less than forty-five (45) days prior to the end of the fiscal year the following budgets covering the School of Medicine's operations for the next fiscal year. These budgets, and any material changes in these budgets during the fiscal year, shall only become effective upon approval by the School of Medicine's Board of Directors and shall be subject to any written policies of the School of Medicine:

(a) Capital Expenditures Budget. A capital expenditure budget setting forth a program of capital expenditures for the School of Medicine for the next fiscal year;

(b) Operating Budget. A budget setting forth an estimate of the School of Medicine's operating revenues and expenses for the coming fiscal year;

(c) Cash-Flow Projection. A projection of the School of Medicine's cash receipts and disbursements based upon the proposed operating and capital budgets, together with recommendations as to the use of projected cash-flow in excess of short-term operating requirements and as to the sources and amounts of additional cash-flow that may be required to meet the School of Medicine's operating and capital requirements.

2.2.2 Duties of the School of Medicine. The School of Medicine shall approve or disapprove the budgets proposed by DMI not later than thirty (30) days after submission of the budgets to the School of Medicine. The School of Medicine shall notify DMI of the action taken.

6

## ARTICLE III

## RESPONSIBILITIES OF THE SCHOOL OF MEDICINE

**Section 3.1** **Educational and Administrative Personnel.** The School of Medicine shall retain responsibility for all employment decisions related to all personnel performing services for the School of Medicine outside the United States, including Administrative Personnel. Personnel employed by the School of Medicine outside the United States include, but are not limited to, Administrative Personnel when performing functions for the School of Medicine outside the United States, faculty and staff of the School of Medicine at its location in Dominica ("Educational Personnel"), and administrative and support staff employed by the School of Medicine outside the United States. Consistent with the directions of the School of Medicine, DMI shall perform administrative functions to assist the School of Medicine in recruiting Administrative and Educational Personnel. Faculty, staff, and other employees on the payroll of the School of Medicine shall not be the employees of DMI. Administrative Personnel when performing their duties for the School of Medicine outside the United States shall not be the employees of DMI. The School of Medicine shall be solely liable to such employees for their wages, compensation, and employee benefits, if any. For purposes of this Section, the term "benefits" shall include the School of Medicine's employment taxes, workers' compensation, pension plan contributions, group life and accident and health insurance premiums, retirement, disability, and other similar benefits, if any.

**Section 3.2** **Educational Records.** The School of Medicine shall be responsible for the generation of all educational records information and shall retain ownership and control of all records pertaining to its students.

## ARTICLE IV

## COMPENSATION

**Section 4.1** **Compensation of DMI.** In consideration of the services provided by DMI under this Agreement, the School of Medicine shall reimburse DMI the amount of expenses incurred by DMI in performing such services pursuant to the Budget attached hereto as **Exhibit B**, plus a fee of ___ percent of the mount so reimbursed.

The expenses and fee shall be payable monthly in arrears based on DMI's Expenses during the prior month. The fee shall be reviewed annually, or at such other times as the parties mutually shall determine necessary or appropriate, and adjusted periodically as the parties may agree. After any such review, if an agreement is not

7

reached as to any adjustment, the existing fees shall remain in effect.

**Section 4.2** **Capital Expenditures.** DMI shall not be obligated to make any capital expenditure out of DMI's funds in connection with its services to the School of Medicine under this Agreement the School of Medicine shall provide or arrange for the lease of equipment required by DMI under Section 1.2, in a manner to be determined by the parties on a case-by-case basis.

## ARTICLE V

## INSURANCE AND INDEMNIFICATION

**Section 5.1** **General Liability Insurance.** The School of Medicine shall, at its expense, maintain in force during the term of this Agreement general liability insurance with an endorsement naming DMI as an additional insured thereunder. The general liability insurance shall contain such coverage as the parties agree is appropriate to protect them against loss in the nature of fire, other catastrophe, theft, public liability, and negligence, in such amounts as the parties shall mutually determine. The liability insurance shall include an extended reporting endorsement ("tail") to cover DMI for a reasonable period following termination of this Agreement. DMI is authorized to obtain the above insurance on the School of Medicine's behalf and at the School of Medicine's expense.

**Section 5.2** **Indemnification.** Each party agrees to indemnify the other, its officers, agents, and employees, and hold them harmless from any and all losses, costs, claims, suits, or damages incurred, including attorney's fees on appeal or otherwise, arising from personal injury or property damage, proximately caused by the negligence or misconduct of the responsible indemnifying party or its officers, agents, or employees. It is the intention of this indemnification provision that the indemnified party, and its officers, agents, and employees will be indemnified against any derivative or vicarious liability arising out of any negligence or misconduct on the part of the indemnifying party, its officers, agents, or employees.

## ARTICLE VI

## TERM AND TERMINATION

**Section 6.1** **Initial Term.** The initial term of this Agreement shall commence on January 1, 1998 and shall continue for a period of three years. On each anniversary of this Agreement, the term of this Agreement shall be extended for an additional year such

8

that on each anniversary date the term of this Agreement shall be three years therefrom, unless notice to the contrary is given by either party at least sixty days prior to any anniversary of this Agreement.

**Section 6.2**  Termination. In addition to the expiration of this Agreement in accordance with Section 6.1, this Agreement may be terminated upon the occurrence of any of the following events:

    6.2.1  Mutual Written Agreement. This Agreement may be terminated upon the mutual written agreement of the parties.

    6.2.2  Material Breach. In the event of a material breach of this Agreement by the either party ("Breaching Party"), the other party ("Non-breaching Party) shall provide written notice (the "Default Notice") to the Breaching Party specifying the nature of the breach. In the event the breach is not cured to the reasonable satisfaction of the Non-Breaching Party within sixty (60) days after service of the Default Notice, this Agreement shall automatically terminate at the election of the Non-breaching Party upon the giving of a written notice of termination to the Breaching Party.

    6.2.3  Insolvency. Either party may terminate this Agreement if the other party (i) applies for or consents to the appointment of a receiver, trustee, or liquidator of itself or of all or a substantial part of its assets, (ii) files a voluntary petition in bankruptcy or admits in writing its inability to pay its debts as they become due, (iii) makes a general assignment for the benefit of creditors, (iv) files a petition or an answer seeking reorganization or arrangement with creditors, or (v) takes advantage of any insolvency law, or if (vi) an order, judgment, or decree shall be entered by a court of competent jurisdiction on an application of a creditor adjudicating the other party to be bankrupt or insolvent, or approving a petition seeking reorganization of the other party or appointing a receiver, trustee, or liquidator of the other party, or of all or a substantial part of its assets, and such order, judgment, or decree shall continue unstayed and in effect for a period of sixty (60) consecutive days, upon thirty (30) days' prior written notice to such other party.

    6.2.4  Immediate Termination by either Party. Either party may terminate this Agreement immediately upon written notice to the other party if a governmental agency determines that the performance of this Agreement violates any law, or otherwise directs that either party cease operations.

    6.2.5  Notice by DMI. DMI may terminate this Agreement without cause by giving at least one (1) year's prior written notice of termination to the School of Medicine.

6.2.6    Notice by School of Medicine. The School of Medicine may terminate this Agreement without cause by giving at least sixty days' prior written notice to DMI.

**Section 6.3**    **Obligations Not Excused.** Termination of this Agreement shall not release or discharge either party from any obligation, debt or liability which shall have previously accrued and remains to be performed upon the date of termination. Further, the terms of Article V and Article VII shall survive the termination of this Agreement.

**Section 6.4**    **DMI's Duties Upon Termination.** Upon termination of this Agreement, DMI shall immediately deliver to the School of Medicine all records of any kind necessary for or related to the School of Medicine's business that are in the possession of DMI.

**Section 6.5**    **School of Medicine's Duties Upon Termination.** Upon termination of this Agreement, the School of Medicine shall assume all liabilities incurred by DMI on the School of Medicine's behalf.

## ARTICLE VII

## PROTECTIVE COVENANTS

**Section 7.1**    **Trade Secrets, Proprietary, and Confidential Information.** DMI shall not disclose, nor permit any of its shareholders, employees, agent, or representatives to disclose, any of the School of Medicine's Confidential Information to any person without the School of Medicine's prior written consent, or utilize the School of Medicine's Confidential Information for any purpose other than the conduct of the School of Medicine's business during the period of this Agreement. For purposes of this Agreement, "Confidential Information" means the trade secrets and other proprietary and confidential information of the School of Medicine including, without limitation: (i) the past, present, and prospective methods, procedures, and techniques used in the operation of the School of Medicine's business; (ii) compilations of information, records, and processes which are owned by the School of Medicine or which are used in the operation of the business of DMI or the School of Medicine, including computer software programs; and (iii) lists containing the names of past, present, and prospective students, employees and suppliers.

10

## ARTICLE VIII

## MISCELLANEOUS PROVISIONS

**Section 8.1** **No General Agency.** DMI shall have no authority to enter into any contract or other agreement for or on behalf of the School of Medicine except upon the prior written direction of the School of Medicine.

**Section 8.2** **Relationship of Parties.** The School of Medicine shall at all times exercise control over the educational services it renders, and DMI shall manage the School of Medicine United States administrative operations strictly in accordance with policies and directives adopted by the School of Medicine. By entering into this Agreement, the School of Medicine does not delegate to DMI any of the powers, duties, and responsibilities vested in the School of Medicine by law. The School of Medicine may, consistent with the terms of this Agreement, direct DMI to implement existing policies and may adopt policy recommendations or proposals made by DMI. DMI is an independent contractor for purposes of this Agreement. DMI and the School of Medicine each expressly disclaim any intent to form a partnership, association, or any other entity, or to become joint venturers by virtue of the execution of this Agreement, and shall not be agents of each other except with respect to agency for billing and collections.

**Section 8.3** **Notices.** All notices required or permitted to be given pursuant to this Agreement shall be in writing and personally delivered or mailed by registered or certified mail, return receipt requested, postage prepaid, to the recipient at the address listed below:

    To DMI at:     460 West 34th Street
                             New York, New York 10001

    To The School of Medicine at:

                          _____
                          _____
                          _____

Either party may change its address for notices by giving notice to the other party in like manner. Notice delivered in accordance with this Section shall be effective as of the date of delivery.

**Section 8.4** **Governing Law.** All questions related to this Agreement shall be governed by the laws the state of New York.

11

**Section 8.5**   **Successors and Assigns.** The rights and obligations under this Agreement may not be assigned by either party without the written consent of the other party. This Agreement and all the terms and provisions hereof shall be binding upon and shall inure to the benefit of DMI, the School of Medicine, and their respective successors and permitted assigns. Any person acquiring or claiming an interest in DMI or the School of Medicine shall be subject to and bound by all the terms, conditions, and obligations of this Agreement to which his predecessor in interest was subject or bound, without regard to whether such person has executed this Agreement or any other document contemplated hereby.

**Section 8.6**   **Additional Assurances.** Upon the request of the School of Medicine, DMI shall perform all further acts and execute, acknowledge, and deliver any documents that the School of Medicine deems reasonably necessary to effectuate the provisions of this Agreement.

**Section 8.7**   **Entire Agreement; Modifications.** This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter, and supersedes any prior negotiations, understandings, and agreements in regard hereto. Only a writing signed by both parties may amend this Agreement.

**Section 8.8**   **No Waiver.** Failure or delay of any party in exercising any right or remedy under this Agreement, or any other agreement between the parties, will not operate as a waiver thereof. The express waiver by any party of a breach of any provision of this Agreement by any other party shall not operate or be construed as a waiver of any subsequent breach. No waiver will be effective unless it is set forth in writing and signed by the waiving party.

**Section 8.9**   **Gender and Number.** As used in this Agreement, the singular form shall include the plural and vice versa, and pronouns shall include the corresponding masculine, feminine, or neuter gender, as appropriate.

**Section 8.10**   **Headings.** The captions in this Agreement are for reference only and shall not affect the construction of this Agreement.

**Section 8.11**   **Validity and Severability.** If any provision of this Agreement contravenes any law, then such provision shall be invalid and subject to severance from the remaining portion of this Agreement, and this Agreement shall be construed as though it did not contain the severed provision in a manner giving effect to the intention of the parties.

**Section 8.12**   **No Third Party Rights.** The terms of this Agreement are solely

for the benefit of the parties hereto. No other person shall be entitled to enforce or make any claims, or have any right pursuant to the provisions of this Agreement.

Section 8.13   Arbitration. Any controversy, dispute, or disagreement arising out of or relating to this Agreement shall be settled by binding arbitration. The arbitration shall be conducted on a confidential basis, strictly in accordance with the terms of this Agreement and the substantive law of New York. The rules of procedure for the arbitration shall be agreed upon by the parties prior to the arbitration based on the nature of the controversy. To the extent that the parties cannot agree, the rules for arbitration of the American Arbitration Association ("AAA") shall apply. The arbitration shall be held before a single arbitrator acceptable to both parties. If the parties cannot agree upon a single arbitrator, either party may request that a neutral arbitrator be selected in accordance with the procedures of the AAA. The arbitration hearing shall be held in New York, New York. Judgment upon the award rendered by the arbitrator shall be final and binding upon the parties and may be entered and enforced in any court of competent jurisdiction.

Section 8.14   Limitation on Liability. DMI shall not, by entering into and performing this Agreement, become liable for any of the existing or future obligations or liabilities of The School of Medicine. DMI shall not be liable for any act or omission performed or omitted by DMI or its officers, directors, employees, or agents in good faith, so long as such act or omission did not constitute fraud, bad faith, gross negligence, or willful misconduct. Any action taken in good faith reliance upon the advice of counsel shall be conclusively deemed not to constitute gross negligence or willful misconduct.

Section 8.15   Confidentiality of Information. DMI shall comply with all laws relating to the confidentiality of educational and financial records, including, but not limited to, the Family Educational and Privacy Rights Act, 20 U.S.C. § 1232g. Except as required by law, without the prior written consent of the School of Medicine, neither DMI nor any of its employees or agents shall disclose information relating to the School of Medicine or any student to any person.

Section 8.16   Changes in Applicable Law. The parties understand that the United States, Dominican, state, and local laws and regulations applicable to this Agreement may be amended from time to time and each agree to execute any amendments to this Agreement necessary to maintain compliance with those laws and regulations.

Section 8.17   Counterparts. This Agreement may be executed in duplicate counterparts, each of which shall be deemed an original and all of which shall constitute the same Agreement.

Section 8.18   Warranties. The parties warrant that each has the legal capacity to enter into this Agreement, that the execution has been duly approved by their respective boards of directors, and that their respective obligations do not violate any statute, ordinance, ruling of any administrative body, or any agreement to which either the School of Medicine or DMI is a party.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the dates set forth below, effective on the date first set forth above.

Dominica Management, Inc.

By: _____     Date: 11/27/97

Title: Chairm_____

Ross University School of Medicine, Limited

By: _____     Date: 11/27/97

Title: President

14