1

```
 1                    UNITED STATES DISTRICT COURT
 2                    SOUTHERN DISTRICT OF NEW YORK

 3     ------------------------------x
 4     DOMINICA MANAGEMENT INC,

 5                    Plaintiff
 6                                        DOCKET NO.: CV-04-7675
 7                    -vs-                New York, New York
 8                                        December 22, 2004
 9     AMERICAN UNIVERSITY OF
10     ANTIGUA, et al.,

11                    Defendants
12     ------------------------------x

13            TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE

14            BEFORE THE HONORABLE FRANK MAAS
15            UNITED STATES MAGISTRATE JUDGE


16     A P P E A R A N C E S:

17     For the Plaintiff:          PETER J. MASTAGLIO, ESQ.
18                                 Cullen & Dykman LLP
19                                 100 Quentin Roosevelt Boulevard
20                                 Garden City, NY  11530


21     For the Defendant:          LEONARD SCLAFANI, ESQ.
22                                 Polatsek & Sclafani
23                                 275 Madison Avenue
24                                 New York, NY  10016




25     Audio Operator:            No Audio Operator

26        Proceedings Recorded by Electronic Sound Recording
27        Transcript Produced by Transcription Service
28     -----------------------------------------------------------
29                        KRISTIN M RUSIN
30                       5686 Sullivan Trail
31                      Nazareth, PA 18064
32                    kmrusin@earthlink.net
```

1    *(Beginning portion of proceeding not recorded.)*

2         MR. SCLAFANI:  -- shortly after that transfer --

3         THE COURT:  The Devry that I see on matchbook covers

4    --

5         MR. SCLAFANI:  Yes, Judge.

6         THE COURT:  -- and subway ads?

7         MR. SCLAFANI:  Right, who is really the -- or should

8    be the plaintiff in this lawsuit.  They own DMI.  They own Ross

9    University as well.

10        My understanding -- and I could be wrong; I don't

11   know which of the two entities, Leeds or D.M. -- or -- or --

12   Devry -- but one or the other of them, long after I was gone,

13   reorganized Ross University and DMI so that Ross University --

14   or DMI became owned by Ross University or some -- according to

15   my adversary, they're affiliated or they're -- they're

16   subsidiaries of some sort, so there must be now ownership.

17        In the letter that he writes, I get the impression

18   that to me -- I get the impression that Ross University now

19   wholly owns DMI, but that wasn't the case during my

20   representation.

21        The claims in this lawsuit involve a computer program

22   that wasn't in existence at the time that I was there.  And in

23   any event, I had no dealings whatsoever with Ross University's

24   computer program, not even in what I would typically be

25   involved in, which was the litigation over payment when Ross

1  University failed to make it, or -- or warranties, or the like.

2  That was basically the nature of my litigation.

3         I wasn't setting company policy.  I wasn't involved

4  in the academic aspects of the university much.  Every once in

5  a while, we had a -- a litigation that involved the Department

6  of Education, but it would be either litigation or arbitration

7  of some sort, some form of adversarial proceeding, not policy

8  in terms of how they recruit, how they get students, how they

9  teach, where they teach, what they do -- really wasn't any of

10  my expertise or involvement.

11         I might get involved in a lease negotiation or

12  something like that, but pretty much I was doing defensive

13  litigation of that type of -- of that nature.

14         The computer system, as I said, that they are talking

15  about in this litigation I haven't a clue about, although I

16  can't say that that is the same for my client.  See, the

17  problem here is that it doesn't matter who the lawyer is.  The

18  institutional information of which they're afraid will be in

19  the hands of the defendants' lawyer, is in the hands of the

20  defendant, not the lawyer.

21         It doesn't matter who I am.  Whatever I could

22  possibly learn from my representation, I have a quarter of the

23  knowledge, a tenth of the knowledge, that Mr. Simon has.  He

24  was the school's president and general counsel.  He was

25  involved in every aspect of the school, up until he left a year

1  and several months ago.  I think maybe it's about a year and a
2  half ago.
3          The manual in question I neither had any involvement
4  in its preparation or publication, nor was I even associated
5  with the school for several years after it was drafted and
6  published.  I left in ninety nine.  They're talking about a
7  2002 catalog.
8          Although my suspicion is, given how these kind of
9  things are done, is that that catalog isn't radically different
10 than the catalog that preceded it, or the one that preceded it,
11 but nevertheless I had no involvement in that.
12         The claim that information about Texas licensure was
13 passed from a Ross University employee to AUA is a recent event
14 that occurred in the year 2004, almost seven years after I left
15 the university.  And I had neither involvement in that document
16 or the issue underlying it or, for that matter, licensure in
17 Texas.  I wasn't really involved much in those issues.
18         THE COURT:  How about -- were you involved at all in
19 developing policies for recruiting students or --
20         MR. SCLAFANI:  No.
21         THE COURT:  -- the like?
22         MR. SCLAFANI:  I had no policy development roles.
23 And in any event, whatever involvement I -- I had really no
24 involvement with students at all, except as one might
25 occasionally sue.  I had a litigation -- I only had a few of

1   those, one litigation out in Suffolk County in which a student

2   claimed entitlement to a diploma even though he didn't meet

3   certain criteria.   There were claims that the university had

4   changed its criteria.

5            And I think there were two litigations where the

6   university had reacted to changes in the United States law and

7   United States testing for admission into either clinical

8   rotations in the United States or its various states, or

9   ultimate licensure in the states, and the university changed

10  its policies and criteria, and there were some students that

11  complained that by and through those changes they were deprived

12  of the right to diplomas.

13           They were ultimately asked to leave the school

14  because they couldn't satisfy the criteria, and they sued and

15  claimed they were entitled to diplomas or they were entitled to

16  continue.

17           One had to do with this test -- there are two tests

18  that you have to take, one before you can do clinical rotations

19  --

20           THE COURT:  Okay.  We don't need to --

21           MR. SCLAFANI:  -- I did that kind of work.

22  Otherwise, I had no involvement whatsoever with the student

23  body, with recruition -- with recruiting of students.   I

24  wouldn't know how they did it or why they did it or where they

25  did it -- or of setting of policy --

6

1          THE COURT:  Is -- is your client the owner of A. --

2   AUA?

3          MR. SCLAFANI:  Sorry, Judge?

4          THE COURT:  Does your client own AUA, or --

5          MR. SCLAFANI:  No, only --

6          THE COURT:  -- have an ownership interest?

7          MR. SCLAFANI:  -- only -- I'm not -- I'm not certain

8   whether he is -- I believe he is not the majority shareholder.

9   I believe he owns shares but he doesn't own the majority.  But

10  he does have control of the -- of a sort.  I think it's more --

11  I think he has more control than ownership.  But I'm -- I can't

12  tell you that for a fact.

13         So -- and -- and I have to say that with respect to -

14  - Your Honor was also very astute.  When I came into this case,

15  I spoke with my adversary at the end of the Weltman deposition,

16  which -- in which it became patently clear that this

17  university, AUA, had been solicited by Mr. Weltman, who wanted

18  to do consulting work, and to install various types of

19  accounting programs and the like.

20         At no time did he say he was giving them Ross

21  University's program, nor did he ever do that, nor did the

22  university ever want it.  But -- and the program that we're

23  talking about is not even the program that Ross used.  It's a

24  program -- that Ross is using.  It's a program that Ross had

25  used.

7

1       It was developed by another individual who Mr.

2  Weltman worked for when he was in Ross University, and that

3  individual had gotten from Ross University a document -- a --

4  an agreement, one or two lines only, that allowed him to take

5  it and use it.

6       And -- and he basically wrote and said look, you

7  know, this is a product of my work, and I would have to

8  recreate this, I can recreate this document, there was no

9  copyright or not --

10       THE COURT:  I gather -- I gather the AUA's present

11  position and your client's position is we're not using it in

12  any event.

13       MR. SCLAFANI:  Well, we never did buy it.  We never

14  used it.  We really never wanted it.  He -- it wasn't even this

15  -- he asked us for a bunch of different types of programs.

16       He really wanted to be associated -- a lot of people

17  at -- at Ross University -- a lot of the employees are unhappy

18  with new management and know Mr. Simon quite well and have --

19  on -- on a regular basis entreat them to become employees

20  and/or to offer services of the like that they provided at

21  Ross.

22       And somehow -- and that's really what this lawsuit is

23  about, is --

24       THE COURT:  Did the -- did the student who Ross fears

25  may have been poached or approached because of theft of some --

1    or misappropriation of some confidential information actually

2    enroll at AUA, do you know?

3               MR. SCLAFANI:  They -- they allege one student was

4    approached.  He didn't enroll.

5               THE COURT:  He did not?

6               MR. SCLAFANI:  He did not.  The one student that they

7    claim was approached -- my client will tell you, as we have

8    told counsel, that AUA buys lists from all over the place.

9    Matter of fact, because Mr. Simon was the general counsel and

10   the president of the university, he knows exactly where to buy

11   these lists from.

12              There's millions of dollars that Ross University

13   spends in obtaining these lists AUA seems to get for

14   substantially cheaper amounts.  There are any number of

15   sources.

16              Your Honor was also astute when you indicated that

17   one student could have told another student, could have told

18   the university my friend is interested in going.  That is a

19   common way that Ross University and AUA would solicit employees

20   -- students, according to what my clients tell me.

21              THE COURT:  Well, let's -- let's switch gears for a

22   second.  And it's unfortunate that we don't have Pryor Cashman

23   and the other firm here, but this sounds like a suit that ought

24   to settle without a lot --

25              MR. SCLAFANI:  Well, I thought --

9

1          THE COURT:  -- I mean, --

2          MR. SCLAFANI:  -- so too.

3          THE COURT:  -- assuming that what you're telling me

4  is correct, and assuming that -- I mean, it -- it -- it sounds

5  like the major motivating force here, as Mr. Mastaglio said, is

6  the notion that you might be poaching students or even rejects

7  and therefore have access to that confidential information.

8          And I gather from what you were telling me that the

9  plaintiffs -- that -- that's the key to the plaintiffs' -- or

10  that that's the reason we're here, as opposed to the student

11  manual, for example.

12          MR. MASTAGLIO:  Obviously, the -- the concept that

13  they may have been out there buying one of our computer

14  programs was -- is elevated --

15          THE COURT:  Right.

16          MR. MASTAGLIO:  -- right to the top of my list.

17  Whether -- whether the facts --

18          THE COURT:  But that -- but that --

19          MR. MASTAGLIO:  -- support that --

20          THE COURT:  -- may have gone by the boards with Mr.

21  Weltman, --

22          MR. MASTAGLIO:  Ah, --

23          THE COURT:  -- subject to --

24          MR. MASTAGLIO:  -- well, --

25          THE COURT:  -- some verification.

1    MR. MASTAGLIO:  -- there's -- there's no question in

2  our mind, not in Mr. Sclafani's -- there's no question in our

3  mind that they were out there buying this -- this program.

4  They may have changed their mind.

5    This -- this two line letter that -- or e-mail to

6  which he refers has nothing to do with ownership of -- of the

7  computer program.  But that would be for the court to decide.

8    But that's a big time item, and -- and -- and the

9  other one is as well.  I put those at a -- at a level higher

10 than the -- than the manual and higher than one or two of the

11 other items, one of which was this Texas thing that --

12    THE COURT:  Well, presumably the -- the student,

13 assuming he or she is in the U.S., can be deposed and I guess

14 may not have great fondness for Ross University but probably

15 has no reason not to explain exactly what happened here.

16    MR. MASTAGLIO:  Oh, we've interviewed her -- I

17 haven't, but she's been interviewed, and -- and her affidavit -

18 - the affidavit of the interviewer is -- was before the court

19 on the --

20    THE COURT:  Okay, and --

21    MR. MASTAGLIO:  -- on the motion.

22    THE COURT:  -- the substance of it is what?

23    MR. MASTAGLIO:  The substance of it is that she got a

24 call and the person said I understand that you've been rejected

25 by Ross University, and, you know, come on and take a -- take a

1  -- take a good look at us, something along those lines.  I

2  don't -- I have the affidavit here, probably.

3        And our expectation is -- is that somehow they got

4  that information.  Now, --

5        THE COURT:  Well, I mean, from a practical viewpoint,

6  if -- if I allow you to make --

7        MR. MASTAGLIO:  It -- excuse me.  I'm sorry, Judge.

8        THE COURT:  Yeah.

9        MR. MASTAGLIO:  Just -- I didn't mean to interrupt

10 you.  I apologize.

11        THE COURT:  No, that's fine.

12        MR. MASTAGLIO:  I should pull the affidavit out, Your

13 Honor, because I think it's a little bit stronger.  I don't

14 think it opens up the possibility that you --

15        THE COURT:  Right.

16        MR. MASTAGLIO:  -- that you indicated, that some

17 student -- other student may have -- may have told the AUA

18 interviewer that -- that the -- that this person failed at

19 Ross, so you ought to -- you ought to talk to them.

20        THE COURT:  But, --

21        MR. MASTAGLIO:  I don't think that's --

22        THE COURT:  -- I mean, one of the things your client

23 wants, and perhaps the key thing your client wants, is

24 injunctive relief, which Judge Berman was trying to help you

25 bring about, or at least give you the opportunity to bring

1   about, through an expedited discovery schedule.

2          But if I grant your application to submit a motion to

3   disqualify, until that gets resolved it seems like everything's

4   going to be on ice, which is counterproductive to the goal you

5   -- you presumably have.

6          One suggestion I have is simply to bring everybody in

7   and see whether we can resolve this case.

8          MR. MASTAGLIO:  Well, we're coming in on Monday, I

9   believe.

10          MR. SCLAFANI:  No, I think it's Wednesday.

11          MR. MASTAGLIO:  Or Wednesday.  It's now --

12          THE COURT:  Oh, is this the one -- did I ultimately

13   set up a --

14          MR. SCLAFANI:  You -- you set --

15          THE COURT:  -- second date --

16          MR. SCLAFANI:  -- Wednesday at ten, --

17          THE COURT:  -- when I realized --

18          MR. MASTAGLIO:  That's right.

19          MR. SCLAFANI:  -- I believe.

20          MR. MASTAGLIO:  Wednesday.  You're right.

21          THE COURT:  Okay.

22          MR. SCLAFANI:  But let me suggest, Judge, that --

23          THE COURT:  Yeah.

24          MR. SCLAFANI:  -- when I came into the case after

25   Pryor Cashman's attempt to resolve the case, I met after the

1  Weltman deposition with counsel, and I said look, you now heard

2  Mr. Weltman's deposition, you understand -- I looked at the

3  manual.  I had copies of it.

4       The manual really isn't the issue here.  You have a

5  claim which my client will tell you is not what was transmitted

6  between the student -- that one student was solicited by AUA

7  that ultimately did not enroll -- we can resolve this case.

8  This isn't a case --

9       THE COURT:  Do AUA -- do AUA's records -- well,

10  first, how big a school is AUA, student body?

11       MR. SCLAFANI:  It's in its first year.  I think it

12  has less than two hundred students, and I think at the time the

13  lawsuit was brought probably enrolled -- at one point, it had

14  twelve students only a short while ago.

15       THE COURT:  Did -- do its records show the source of

16  introduction to a particular --

17       MR. SCLAFANI:  Not necessarily.

18       THE COURT:  -- candidate?

19       MR. SCLAFANI:  Not necessarily, partly because they

20  don't have the kind of computer systems that would track those

21  things, because they didn't have the money or the resources to

22  buy any of those things or to set them up.  It's those kind of

23  things that they're claiming that were stolen, but, in fact,

24  they don't exist.

25       THE COURT:  Well, if they -- were they buying lead

1   sheets, or --

2        MR. SCLAFANI:  They were buying lists.  They were

3   getting information from students.  They were getting

4   information from former employees, all sorts of different

5   sources, of who might be interested and where they might --

6   they might look for students.

7        They were publishing.  They had their own forms of

8   advertisements, of -- of -- that the marketplace -- you -- you

9   -- you gotta understand, Judge, there are only a handful of

10  these not -- these for-profit medical schools.  They're --

11       THE COURT:  Right.

12       MR. SCLAFANI:  -- Caribbean medical schools.  We call

13  them international medical schools.  But the fact of the matter

14  is they're all in the Caribbean because the student body is

15  primarily American.

16       They -- they do their student work, their classroom

17  work, in -- in the -- the -- the classrooms in the -- in the

18  Caribbean, and then they do clinical rotations in -- with the -

19  - the universities, the foreign universities, the Caribbean

20  universities -- they get affiliation agreements with the

21  various hospitals all over the United States, and if they're

22  lucky enough to get clearance from the state education

23  departments, they can -- they can then have their students do

24  training, clinical training, --

25       THE COURT:  Right.

1          MR. SCLAFANI:  -- in the United States.  Those

2    students are primarily Americans.  They -- they want to finish

3    their clinical training and then apply for American licensure.

4    They're not, by and large, foreigners.  So the -- there are

5    only a handful of these schools.

6          Matter of fact, when Ross started there were three.

7    One of them was -- was in -- in -- I don't think it was in

8    Antigua, but it was --

9          MR. MASTAGLIO:  Grenada.

10          MR. SCLAFANI:  No, there was Grenada, and Your Honor

11    would remember the war in Grenada --

12          MR. MASTAGLIO:  Yeah.

13          MR. SCLAFANI:  -- to rescue the students.

14          THE COURT:  Right, I remember that.

15          MR. SCLAFANI:  It was the Grenada medical school.

16    And one of them I -- I fondly call Crazy Eddie School of

17    Medicine, because it was formed by Eddie Antar, who was the

18    criminal that, --

19          THE COURT:  Right.

20          MR. SCLAFANI:  -- you know -- he actually formed that

21    medical school, and it was a competitor of Ross University at

22    the time.  There are only a handful of these things.  There are

23    not a thousand of them.

24          Everybody who is looking to go to medical school

25    knows where they are.  They know who they are.  They know where

16

1   the students come from.  They know who gets rejected.  They --

2   they -- the -- the biggest war between the universities is the

3   exchange of students.

4           They raid each other's students on a regular basis.

5   They have solicitation.  They have -- they have people that go

6   to the other universities --

7           THE COURT:  So somebody might do their first year at

8   Ross and their second year at --

9           MR. SCLAFANI:  Say it again?  Oh, switching all the

10  time, on a regular basis, switching back and forth for one

11  reason or another.  The good portion of Ross University

12  students are former -- a good portion of AUA students are

13  former Ross University students, which is one of the reasons

14  why this lawsuit exists, all right?

15          They can't claim actionable conduct, but nevertheless

16  the competition is fierce for those kind of students.  And the

17  idea here is more than to shoot across the bow.  The idea here

18  is to sink a -- a -- a startup university and involve it in a

19  major litigation.

20          I tried to settle it.  I said look, you know, you got

21  one student here, you know, we'll tell you what the source is

22  to the extent we know, --

23          THE COURT:  Well, that -- that --

24          MR. SCLAFANI:  -- what the catalog issue is, so that

25  -- so that we'll calm any fears that you have that we have Deep

1  Throat deep inside your university.  The -- the -- the Texas

2  issue is an issue that you might wind up with Rule 11 sanctions

3  on.

4          The catalog issue might fall in the same category.

5  You -- this -- this -- you -- you might even find the same to

6  be true of this -- well, they might have some --

7          THE COURT:  Well, focusing on the --

8          MR. SCLAFANI:  -- so I said look, --

9          THE COURT:  Wait.

10         MR. MASTAGLIO:  Judge, --

11         MR. SCLAFANI:  -- I said let's --

12         THE COURT:  Focusing on the student for a moment,

13  presumably even if the record keeping is not computerized, that

14  student probably is either on a lead sheet, or is on a form

15  that somebody sent in saying here are my friends who you might

16  want to contact, or I suppose it could have been a conversation

17  with, you know, somebody in recruiting and therefore not

18  documented.

19         But if there is a document that reflects where the

20  student's name came from, --

21         MR. SCLAFANI:  I -- I don't know if there is or not.

22  I -- I've asked them to search, partially because they're not

23  computerized, to -- to see if they can trace back by documents

24  all of the different solicitations and all the --

25         THE COURT:  Go back behind the table, because

 1    otherwise -- you're -- you're only getting --

 2              MR. SCLAFANI:  I -- I keep doing that.

 3              THE COURT:  -- picked up to the extent my

 4    microphone's picking you up.

 5              MR. SCLAFANI:  I -- I've asked them to --

 6              MR. MASTAGLIO:  Mr. --

 7              MR. SCLAFANI:  -- I've asked them to check through

 8    their -- their records and see if they can compare students to

 9    -- to solicitations.  They say it's virtually impossible.  They

10    really don't know where -- where they get these things from.

11              They can't really match them up.  They have some

12    idea.  They have some lists.  I said go through your lists and

13    see if any are on the list.  They don't always save the lists.

14    They go through them.  They make the solicitations.  They are

15    not sophisticated.

16              THE COURT:  What --

17              MR. MASTAGLIO:  Mr. --

18              THE COURT:  -- what schedule --

19              MR. MASTAGLIO:  -- Mr. --

20              THE COURT:  -- did Judge Berman set?  You said he --

21              MR. MASTAGLIO:  He didn't.  He just told us that --

22    to go forward with the four depositions that we had.  There was

23    an agreement that the defendants could answer after the

24    depositions were completed.  It was hoped that they would be

25    completed by the end of November.  Obviously, this issue has

1    come in.

2            We did have a conference -- the general counsel of --

3    of DMI and I with Mr. Sclafani after the Weltman deposition.

4    We did say to him that we'd be happy to -- you know, once these

5    three more depositions are over with, to take a hard look at

6    the entire case, and if there's anything that -- you know, that

7    can be resolved, we'd be happy to do it.

8            We had an agreement to complete the remaining three

9    depositions, and we wanted to find out what happened in these

10   instances, and, you know, we wanted to talk to their recruiter,

11   who was the person who had -- who had -- who had spoken to the

12   rejected student, and, you know, we were more than willing to -

13   - to sit down and talk, and -- but, you know, we've -- we want

14   to find out what happened.

15           THE COURT:  Well, it's -- it sounds like the major

16   player on AU's side is Mr. Simon, correct?

17           MR. SCLAFANI:  I -- I would say that he's --

18           THE COURT:  I mean, the decision maker.

19           MR. SCLAFANI:  -- one of the -- I mean, the

20   depositions they want are all major players.  My client -- I

21   wasn't at that meeting, but I --

22           THE COURT:  No, I -- I'm -- I'm -- I'm focusing on --

23           MR. SCLAFANI:  Yeah.

24           THE COURT:  -- a different area in terms of --

25           MR. SCLAFANI:  Yeah.

1          THE COURT:  -- resolving the suit.

2          MR. SCLAFANI:  Right.

3          THE COURT:  Mr. Simon, I take it, is the person on

4    AU's side, is that --

5          MR. SCLAFANI:  Probably not --

6          THE COURT:  -- notwithstanding the --

7          MR. SCLAFANI:  -- the most significant.

8          THE COURT:  -- fact that -- oh, okay.

9          MR. SCLAFANI:  Probably not the most significant.

10   Probably not the person that had the -- that was the acting

11   party here.

12          He was more -- in this context, his involvement has

13   been more in terms of dealing with licensure issues.

14          THE COURT:  No, I -- I'm focusing on settlement.

15          MR. SCLAFANI:  On settlement?  I would say him and --

16   and his -- his partner, Harvey Marshak.

17          MR. MASTAGLIO:  Marshak.  He's -- he's the fourth

18   person we were going to depose, Harvey Marshak.

19          THE COURT:  And does Mr. Simon -- well, I guess he's

20   probably down in Dominica, is that right?

21          MR. SCLAFANI:  No.  Their -- their offices are here.

22   The -- these --

23          THE COURT:  Oh, okay.

24          MR. SCLAFANI:  He goes down to Antigua.  His

25   university is Antigua.

1           THE COURT:  Oh, okay.  Right.

2           MR. SCLAFANI:  They go down there from time to time,

3  but -- but the -- the real work is done here, and that's also

4  true of Ross University.  They're now in New Jersey.

5           MR. MASTAGLIO:  That's right.

6           THE COURT:  That was going to be my next question.

7  So there's somebody in Teaneck or someplace who --

8           MR. MASTAGLIO:  Edison.

9           MR. SCLAFANI:  They're all there.

10          MR. MASTAGLIO:  Edison, Your Honor.  There surely is.

11 There's the general counsel.

12          MR. SCLAFANI:  The teachers are down there, and the

13 buildings, but the work goes on here.

14          THE COURT:  Does it make sense to have some of those

15 honchos show up at the next conference?

16          MR. MASTAGLIO:  Sure.  I mean, it's -- it's always of

17 value to -- to have the Court try to mediate something.  And

18 obviously, the position that we had taken when we were talking

19 to Mr. Sclafani and we were talking to the Pryor Cashman

20 partner a couple weeks before that was let us find out what was

21 going on, and then we'd be happy to sit down and -- and see if

22 we could resolve this.

23          Your Honor is suggesting that we meet with you --

24          THE COURT:  I mean, because as a practical matter, if

25 I say fine, make your motion -- and that may be, you know,

1 where I end up, but it's going to take a little while for you

2 to make your motion.

3          It's going to take a while for Mr. Sclafani to

4 respond, and meanwhile, by definition, nothing can go forward

5 by way of discovery, while --

6          MR. MASTAGLIO:  The other -- the other alternative

7 would be that we go forward with the depositions.  We reserve

8 our rights to make the motion, and -- so we're not prejudiced

9 by having gone forward with the depositions with Mr. Sclafani

10 as -- representing Mr. Simon, and then after the depositions of

11 --

12          THE COURT:  But that might prejudice Mr. Simon --

13          MR. MASTAGLIO:  That's possible, but --

14          THE COURT:   -- in that if you decide you want to go

15 forward, he's handing off the case to somebody else -- Mr.

16 Sclafani's handing off the case if you prevail to somebody who

17 hasn't seen the first four deponents.

18          MR. MASTAGLIO:  I understood that.

19          MR. SCLAFANI:  It actually prejudices all of the

20 clients, and -- and although I wasn't at that -- that

21 conference in which counsel tells us an agreement was reached

22 about these four depositions, I'm told by the Pryor Cashman

23 firm that -- that Mr. Mastraglio is not accurately reporting

24 the --

25          MR. MASTAGLIO:  I have a letter.

1          MR. SCLAFANI:   -- nature of the agreement.

2          MR. MASTAGLIO:  I have a letter from them.

3          MR. SCLAFANI:  All right.  The -- the -- my

4    understanding is that --

5          THE COURT:  Wait.  You lost me.  Is not accurately

6    reporting what?

7          MR. SCLAFANI:  The nature of the agreement.  He says

8    that there was an agreement reached that he would get four

9    depositions, and everything else would -- that he would proceed

10   with those four depositions.  My understanding from the Pryor

11   Cashman firm was that they agreed to, quote, expedited

12   discovery.  We wouldn't have to answer.

13         What happened after the Weltman deposition -- during

14   the Weltman deposition, it became patently clear that they had

15   information and documents that they hadn't shared with us, and

16   it made it impossible for us to defend the depositions.

17         THE COURT:  Well, --

18         MR. SCLAFANI:  So --

19         THE COURT:  -- the case was referred to me for

20   general pretrial, so for better or for worse, if I can't figure

21   out what Judge Berman said -- well, I guess this was -- was

22   this just an agreement, or this was Berman's directive?  I take

23   it --

24         MR. MASTAGLIO:  It was -- Your Honor, -- Your Honor,

25   --

1      MR. SCLAFANI:  It was an agreement made on a -- on --

2  as I understand it, an order to show cause seeking expedited

3  discovery was made and --

4      THE COURT:  And it was presented as a fait accompli

5  to Judge Berman?

6      MR. SCLAFANI:  -- and the parties entered into a -- a

7  -- an oral agreement with respect to that, and the Pryor

8  Cashman firm tells me that the agreement was that they would

9  engage in expedited discovery, not that they would be precluded

10  from their own discovery.  They did agree to provide these

11  depositions.

12      THE COURT:  Well, I -- I -- I do have to say that --

13  I mean, if there's going to be at some point a -- a hearing on

14  injunctive relief, it can't very well go forward with one-sided

15  discovery.

16      On the other hand, it may be that because of some of

17  the squirrelly issues in this case that maybe the plaintiff

18  goes forward with a series of depositions before the defendants

19  go forward with them.

20      But since the case was referred to me for general

21  pretrial, in -- in -- in some respects it doesn't much matter

22  what Judge Berman had in his mind.  The problem for all of you

23  now will be what I conclude makes sense.

24      MR. MASTAGLIO:  Judge, if I can just address this,

25  that I'm misstating, you know, the -- the -- the concept of --

1  there was an agreement.  There was a letter --

2          THE COURT:  Well, let -- let me suggest this.  Why

3  don't you send to me -- we have our conference Wednesday, you

4  said?

5          MR. MASTAGLIO:  Yes, we do.

6          THE COURT:  On Monday, send it to me overnight if you

7  could, a copy of the complaint, a copy of the affidavit --

8  well, I guess it's a copy of whatever papers you were

9  submitting to Judge Berman which include the affidavit, and if

10  there's some letter agreement that deals with this, send me

11  that also.

12          MR. MASTAGLIO:  I will.  And you want our clients

13  here for -- for Wednesday?

14          THE COURT:  Yeah, it seems to me -- and I guess that

15  ought to be communicated to the two other lawyers as well.

16          MR. SCLAFANI:  Let me suggest this, Judge, so that we

17  just -- because I really don't want to expend unnecessary legal

18  fees on this rather fragile institution that now has two

19  counsel.  After my discussion with Mr. Mastraglio in which --

20          MR. MASTAGLIO:  Mastaglio.

21          MR. SCLAFANI:  I'm sorry?

22          MR. MASTAGLIO:  Mastaglio.  I'm sorry.

23          MR. SCLAFANI:  I -- I'm --

24          THE COURT:  I was struggling with it also.  Do it one

25  more time.

1           MR. MASTAGLIO:  Mastaglio.

2           MR. SCLAFANI:  Mastaglio.  I'm sorry.

3           THE COURT:  The G is silent.

4           MR. MASTAGLIO:  The G is silent.

5           MR. SCLAFANI:  You know what?  You're the first

6  person that I know that has that that actually pronounces it

7  correctly.  I have a client by the name of Battapaglia, and I

8  say Battapalia [phonetic], and he says no, and it's Mastraglio.

9           MR. MASTAGLIO:  Thank you.

10           THE COURT:  Well, it's particularly unforgivable for

11  Sclafani to be messing it up.

12           MR. SCLAFANI:  Exactly.  But in any event, after my

13  conversation, I spoke with Mr. -- in which I basically

14  suggested that we would agree to full injunctive relief.

15           We wouldn't solicit any students, we wouldn't take

16  any of his lists, we wouldn't -- we -- we wouldn't -- we -- we

17  -- we'd stop using the catalog.  We would -- I don't know what

18  you could do about the Texas thing, but, you know, we wouldn't

19  have further conversations with them, that -- you know,

20  suggested that we could resolve this case with injunctive

21  relief.

22           The fact of the matter is that there isn't a whole

23  lot in the way of money here unless we have some trumped up

24  claims that -- we don't use their computer program.  We'll

25  agree that we won't use it in the -- in the future if we ever

1   got our hands on it, which we don't have any intention of doing

2   anyway.

3           It's a program that didn't work for them.  It

4   certainly isn't going to work for us.  It's not the program

5   they currently use, at least as far as I understand it.

6           The -- but when that failed, my client, Mr. Simon,

7   who had a prior relationship because of dealings with Ross

8   University and Devry itself, contacted Devry's president, who

9   he knows, and said look, you know, let's see if we can't work

10  this thing out, and he originally indicated a desire to do

11  that, but he had to call back and say that he was advised by

12  counsel not to have those discussions.

13          So when my adversary tells you that he's anxious to

14  have mediation and the like, what they're really anxious to do

15  is draw up these legal fees.  This is why this issue of my

16  representation --

17          MR. MASTAGLIO:  Judge, --

18          THE COURT:  Well, what they --

19          MR. SCLAFANI:  -- is involved.

20          THE COURT:  -- what they're probably anxious to do is

21  knock off four depositions before they decide what to do.  But

22  --

23          MR. MASTAGLIO:  And we don't want the president or

24  chairman of Devry talking to Neil Simon, who's a lawyer,

25  without counsel being present.

1    THE COURT:  Well, --

2    MR. MASTAGLIO:  And there's --

3    THE COURT:  -- I -- I still think -- why don't you

4 communicate --

5    MR. MASTAGLIO:  That's not the way to settle the

6 case.

7    THE COURT:  -- to the two other lawyers involved, Mr.

8 Flauman [phonetic] -- who's the other?

9    MR. MASTAGLIO:  Pryor Cashman.  Zuckerberg, Joshua

10 Zuckerberg.

11    THE COURT:  Okay, that I want, you know, a decision

12 maker for each side here on Wednesday.  How much -- let me just

13 make sure that I have enough time to --

14    MR. MASTAGLIO:  Judge, I don't think you need Mr.

15 Weltman.  May I make --

16    THE COURT:  No, Mr. Weltman doesn't sound like deep

17 pocket here.

18    MR. MASTAGLIO:  No.

19    THE COURT:  Bear with me a second.

20    MR. SCLAFANI:  I think he's planning on being here.

21 Oh, Mr. Weltman himself?

22    MR. MASTAGLIO:  Weltman himself.

23    THE COURT:  Yeah.

24    MR. SCLAFANI:  Unless you're going to drop --

25    THE COURT:  No, counsel should be here, but --

1          MR. SCLAFANI:  Well, for settlement, I would think

2    that he would, if -- unless you're dropping your claim.

3          THE COURT:  Well, I would think Mr. Weltman will go

4    along with whatever everybody else thinks works.  Yeah.

5          MR. SCLAFANI:  We -- we -- we indicated that -- that

6    after the Weltman deposition, because we had no documents, and

7    they were using documents that would have come in -- said these

8    -- we can't even, you know -- these are third party

9    depositions.

10         They're -- that was a third party -- or a deposition

11   of people other than our client, and even depositions of our

12   client -- we really can't prepare for those depositions without

13   certain exchange of information, at least the minimal

14   information.

15         So Pryor Cashman called and asked for Rule 26

16   information, and my understanding from them is that there was a

17   -- an agreement to provide that before the next deposition, and

18   that was before this issue of my representation arose.

19         THE COURT:  Well, whatever --

20         MR. SCLAFANI:  But that information was never

21   forthcoming.

22         THE COURT:  -- dates were scheduled were in November,

23   so the dates that were scheduled have gone by the boards,

24   correct?

25         MR. MASTAGLIO:  That's correct.

1         MR. SCLAFANI:  Pretty much.  So what I --

2         THE COURT:  Okay, so we'll deal -- we'll deal with

3  all of that on Wednesday.

4         MR. SCLAFANI:  Okay, fine.

5         MR. MASTAGLIO:  Right.  I haven't -- I have to

6  contact my client, obviously, and see as to her availability,

7  obviously.  She'll --

8         THE COURT:  Right.

9         MR. MASTAGLIO:  -- she'll make herself available,

10  unless she's out of the country, I -- I would think.

11         THE COURT:  Okay.

12         MR. MASTAGLIO:  If there's a problem, I'll let you

13  know.

14         THE COURT:  Please.

15         MR. SCLAFANI:  I don't -- the general counsel

16  wouldn't be the person that makes the settlement decisions.

17         THE COURT:  Well, whoever it is, bring him, --

18         MR. MASTAGLIO:  I think that's for us to decide.

19         THE COURT:  -- him or her, or -- or both of them, if

20  need be.

21         MR. SCLAFANI:  I think they need to bring the person

22  that holds the purse strings, not the person that instigates

23  the litigation.

24         MR. MASTAGLIO:  We're not paying money here, Your

25  Honor.  I don't -- I think the general counsel can decide on

1   injunctive relief.

2           THE COURT:  Okay.  I mean, if -- as long as it's not

3   somebody who says I need to go make a phone call to resolve

4   this.

5           MR. MASTAGLIO:  Well, I mean, I -- I can't say where

6   the -- she would be the most important person --

7           THE COURT:  Well, find out, and if it --

8           MR. MASTAGLIO:  -- at -- at Ross University.

9           THE COURT:  -- if it -- if it means bringing two

10  people, bring two people.

11          MR. MASTAGLIO:  No, but what I'm saying is she's --

12  she's the -- the -- the main person at Ross University and --

13  and DMI.  Whether somebody at Devry, for example, in Chicago

14  would -- would have to somehow be involved in -- she would make

15  a recommendation.  That's a different story.  I'm not -- I'm

16  not --

17          THE COURT:  Okay.  Well, there's always sort of a

18  judgment call.  I mean, if it's a public company, typically,

19  you know, in major litigation the board of directors has to get

20  involved, but --

21          MR. MASTAGLIO:  That's right.

22          THE COURT:  -- there's usually general counsel or

23  somebody who can provide a good indication as to what's

24  acceptable or not.

25          MR. MASTAGLIO:  She can do that.



1          THE COURT:  Okay.

2          MR. SCLAFANI:  Thank you, Judge.

3          MR. MASTAGLIO:  Thank you, Your Honor.

4          THE COURT:  See you Wednesday.

5                    *     *     *     *     *

6          I, KRISTIN M. RUSIN, court approved transcriber, certify that the foregoing is

7    a correct transcript from the official electronic sound recording of the proceedings in the

8    above-entitled matter.

9          Transcript is certified original only if signed in green ink.

10    _____          _____